UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ASHLEY D.[1],

                            Plaintiff,                    Civil Action No. 22-11344

v.                                           Linda V. Parker
                                           United States District Judge

COMMISSIONER OF                    David R. Grand
SOCIAL SECURITY,                 United States Magistrate Judge

                          Defendant.
_____/

**REPORT AND RECOMMENDATION ON
CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 13, 15)**

Plaintiff Ashley D. ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions (ECF Nos. 13, 15), which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

**I.    RECOMMENDATION**

For the reasons set forth below, the Court finds that substantial evidence supports the Administrative Law Judge's ("ALJ") conclusion that Plaintiff is not disabled under the

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

Act.   Accordingly, the Court **RECOMMENDS** that the Commissioner's Motion for Summary Judgment **(ECF No. 15)** be **GRANTED,** Plaintiff's Motion for Summary Judgment **(ECF No. 13)** be **DENIED,** and that pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision be **AFFIRMED**.

## II.   REPORT

### A.   Background

Plaintiff filed her applications on February 20, 2019, and alleged a disability onset date of March 3, 2018, at which time she was 31 years old.  (PageID.54, 254, 258).[2]  At 5'6" tall, she weighed approximately 120 pounds during the relevant time period.  (PageID.292).  She completed a one year of college.  (PageID.293).  She currently lives in a house with her significant other, children, and father.  (PageID.303).  Previously, Plaintiff worked as a food sales clerk and informal waitress.  (PageID.64, 96).  Plaintiff's alleged disabling conditions include fibromyalgia, severe migraines, eye sensitivity, right side body numbness, back/neck pain, hip pain, pelvic pain, anemia, anxiety/panic attacks, and lupus.  (PageID.109, 292).

After Plaintiff's applications for SSI and DIB were denied at the initial level on April 1, 2020 (PageID.135, 144), she timely requested an administrative hearing, which was held on April 6, 2021, before ALJ Laura Chess (PageID.72-107).  Plaintiff, who was represented by attorney Kimberley Lamb, testified at the hearing, as did vocational expert ("VE") Heather Smith.  (*Id.*).  On April 29, 2021, the ALJ issued a written decision finding

---

[2] Standalone citations to "PageID. __" are all to the administrative transcript in this case, which can be found at ECF No. 9.

that Plaintiff is not disabled under the Act.  (PageID.51-66).  On April 14, 2022, the

Appeals Council denied review.  (PageID.40-42).  Plaintiff timely filed for judicial review

of the final decision on June 16, 2022.  (ECF No. 1).

The Court has thoroughly reviewed the transcript in this matter, including Plaintiff's

medical record, function and disability reports, and testimony as to her conditions and

resulting limitations.  Instead of summarizing that information here, the Court will make

references and provide citations to the transcript as necessary in its discussion of the

parties' arguments.

### B.    The ALJ's Application of the Disability Framework Analysis

Under the Act, DIB and SSI are available only for those who have a "disability."

*See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in

relevant part as the:

> [I]nability to engage in any substantial gainful activity by reason of any
> medically determinable physical or mental impairment which can be
> expected to result in death or which has lasted or can be expected to last
> for a continuous period of not less than 12 months.

42 U.S.C. §1382c(a)(3)(A).  The Commissioner's regulations provide that a disability is to

be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful
> activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or
> combination of impairments that "significantly limits . . . physical or
> mental ability to do basic work activities," benefits are denied without
> further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful
> activity, has a severe impairment that is expected to last for at least

3

twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. §§ 404.1520, 416.920); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

Following this five-step sequential analysis, the ALJ found that Plaintiff is not disabled under the Act.  At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of March 3, 2018.  (PageID.56).  At Step Two, the ALJ found that Plaintiff had severe impairments of systemic lupus erythematosus ("SLE"), degenerative changes of the cervical spine with spondylosis, degenerative changes of the lumbar spine with radiculopathy, wedging in the thoracic spine at the T1 level, chronic pain syndrome, headache disorder, anemia, patellar chondromalacia, fibromyalgia, depressive disorder, and anxiety disorder.  (*Id.*).  At Step Three, the ALJ found that Plaintiff's impairments, whether considered alone or in

combination, do not meet or medically equal a listed impairment.  (PageID.57).

The ALJ then assessed Plaintiff's residual functional capacity ("RFC"), concluding

that she is capable of performing light work, with the following additional limitations:

> [S]he can lift and/or carry 20 pounds occasionally and 10 pounds
> frequently.  The claimant can never climb ladders, ropes, or scaffolds.
> The claimant can only occasionally climb ramps and stairs.   The
> claimant can frequently balance.  The claimant can occasionally stoop,
> kneel, and crouch. The claimant can never crawl.  The claimant can
> frequently reach and handle with both upper extremities.  There can be
> only occasional exposure to extreme heat and vibration.  There can be
> no work in very loud environments, as defined by the Selected
> Characteristics of Occupations.  There can be no work at unprotected
> heights or in the vicinity of uncovered unguarded moving machinery.
> The claimant can understand, remember, and carry out simple
> instructions and make simple work-related decisions, with only
> occasional changes in a routine work setting.   There can be no
> production rate pace, such as work on an assembly line.

(PageID.60).

At Step Four, the ALJ found that Plaintiff is unable to perform any past relevant

work.  (PageID.64).  At Step Five, the ALJ found, based in part on the VE's testimony,

that given Plaintiff's age, education, work experience, and RFC, she was capable of

performing unskilled light work as an inspector and hand packager (80,000 jobs

nationally), small products assembler (280,000 jobs), and mail clerk (170,000 jobs).

(PageID.65).   Thus, the ALJ concluded that Plaintiff was disabled under the Act.

(PageID.66).

## C.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final

administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute

is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted). The phrase "substantial evidence" is a "term of art …." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted). "Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Id*. (internal citations omitted). "And whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence … is 'more than a mere scintilla.'" *Id.* (internal citations omitted). Specifically, "[i]t means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (internal citations omitted).

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole. *See Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing

6

in his written decision every piece of evidence submitted by a party.") (internal quotations omitted).  If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."  *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (citations omitted).

**D.    Analysis**

In her motion for summary judgment, Plaintiff raises three arguments.   First, Plaintiff argues that the ALJ failed to properly evaluate her subjective complaints related to SLE.  Second, she argues that the ALJ failed to properly evaluate the medical opinion of Christopher Blanchet, PA-C.  Finally, she argues that the ALJ failed to discuss or include a medical need for an emotional support dog in assessing the RFC.  These arguments are addressed in turn below.

> *1.    Plaintiff Fails to Show Reversible Error in the ALJ's Evaluation of Her Subjective Complaints, which is Supported by Substantial Evidence*

Plaintiff first challenges the ALJ's determination that her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision."  (PageID.61).

As to Plaintiff's subjective complaints, the ALJ stated in part that:

> The claimant's allegations are only partially [consistent] with the objective medical evidence and the claimant's activities of daily living. The claimant alleged that her chronic pain, fatigue, and other impairment related symptoms were severe enough to cause suicidal ideation, but this allegation is inconsistent with the claimant's constant

denial of suicidal ideation, depression, and other impairment related symptoms. The claimant does not mention needing substantial assistance with showering in her treatment records or her function report. Diagnostic imaging results confirm the claimant's impairments, but do not support the severity of the claimant's allegations. The claimant has received significant relief from the conservative treatment methods like chiropractic therapy and medication. The claimant's physical and mental status examinations have been relatively unremarkable. Finally, while the claimant's impairments have [limited her] functional capacity, the claimant has still engaged in social and physical activities and can still help take care of her kids, perform some chores, and independently complete several activities of daily living.

(PageID.62-63) (citations omitted).

Plaintiff argues that "[a] reading of the entire decision reveals the ALJ's emphasis and reliance on objective findings such as diagnostic imaging and normal physical examinations . . . [b]ut these findings are not relevant to an evaluation of a claimant's autoimmune disorders such as lupus/SLE." (ECF No. 13, PageID.692). However, the Court finds no error in this regard. As an initial matter, it is undisputed that the ALJ found SLE to be one of Plaintiff's several severe impairments. While Plaintiff argues that the ALJ improperly emphasized objective findings in assessing her subjective complaints, she overlooks that the ALJ's assessment was not limited to symptoms arising from SLE alone, but also to those arising from her *other severe physical impairments* of "degenerative changes of the cervical spine with spondylosis, degenerative changes of the lumbar spine with radiculopathy, and wedging in the thoracic spine at the T1 level," for which evidence of unremarkable findings via diagnostic imaging and physical exams are directly on point. (PageID.61-62).

Even as to symptoms specifically related to SLE, the ALJ's observation of

Plaintiff's ability to perform certain physical movements in exams is hardly irrelevant to assessing the consistency of Plaintiff's statements concerning the *intensity, persistence, and limiting effects* of SLE with the physical capacity she actually demonstrated during numerous office visits.  For example, Plaintiff stated in her function report that she "physically can't stand or fu[n]ction because of to[o] much pain or drop[s] things or she falls" and can walk only "a few feet," and she testified before the ALJ that she "couldn't stand up," "couldn't move," "was falling to the ground," and was "losing [her] balance." (PageID.91, 318).  Thus, it was proper for the ALJ to discuss contrary observations in the medical records showing Plaintiff regularly exhibited "normal gait" and "good balance," "full strength" in her extremities, "good range of motion in all major joints, [and] no muscle wasting or atrophy."  (PageID.62).

Indeed, treatment notes from Plaintiff's primary care physician, Dr. Matthew Mazur, D.O., reflect that, while Plaintiff complained of pain and fatigue, exam findings between 2017 through 2020 routinely indicated she was walking and standing normally with good balance, full strength, and/or adequate range of motion.  (*See* PageID.445 (March 23, 2017 exam finding unremarkable musculoskeletal system, normal gait/stance, and recommendation to "cont[inue] exercise/yoga"); PageID.442-44 (April 11, 2017 exam finding normal gait/stance, "5/5 strength in all ext[remitie]s," and "still doing exercises"); PageID.438-40 (June 23, 2017 exam finding same); PageID.436 (Plaintiff reporting on August 4, 2017 visit[3] "[g]ood exercise habits yoga"); PageID.431-33 (March 21, 2018

---

[3] This visit appears to have been with one of Dr. Mazur's colleagues, Dr. Jessica A. Kiley, M.D.

exam finding musculoskeletal system had intact range of motion of the hips and no tenderness, no swelling of feet, and normal gait/stance); PageID.415-17 (April 9, 2018 findings of normal gait/stance and normal musculoskeletal system); PageID.427-29 (same findings in July 25, 2018, noting "Fibro pain" was "stable/better" and Plaintiff "is walking daily"); PageID.419-21 (December 11, 2018 exam finding tenderness along spine but no swelling of feet and normal gait/stance); PageID.408-09 (Dr. Mazur stating on March 1, 2019 that "Reflexes are equal and physiologic in all four extremities and I really could not detect any consistent motor deficits, although effort was somewhat questionable in the right upper extremity. . . . She has good range of motion in all major joints with no evidence of joint effusion or erythema noted.  There is no muscle waste or atrophy noted . . . Gait is normal.  Balance is good. . . . I do not think that interventional pain procedures would likely be in [Plaintiff's] best interest or be effective . . . [and] talked about the importance of maintaining her mobility and activity level despite ongoing symptoms."); PageID.416-17 (same normal gait/stance and unremarkable musculoskeletal system in April 9, 2019); PageID.479-81 (Plaintiff reporting in July 9, 2019 that she was "walking," "riding bike," and "staying active," with exam findings of normal gait/stance and otherwise unremarkable musculoskeletal system with no swelling); PageID.475-77 (October 10, 2019, exam finding intact range of motion of hips, no swelling, normal gait/stance); PageID.569 ("no motor disturbances" and same normal findings on March 13, 2020); PageID.564 (same in June 16, 2020)).

Dr. Mazur's findings are also consistent with Plaintiff's treatment note at the University of Michigan neurology outpatient clinic in February 2020, during which an

exam with Dr. Gail Joan Olive Francis, M.D., showed "no pedal edema or atrophic changes in the extremities," "no musculoskeletal deformities," "normal muscle bulk, and tone, in all 4 extremities," "straight leg raising was negative bilaterally and there was no paraspinal tenderness," "excellent strength, 5/5, proximally and distally in the deltoids, biceps, and grasps were symmetrical and 5/5," "excellent strength" in lower extremities "with flexors at 5/5 and extensors and flexors of the knees at 5/5 and dorsiflexors and plantar flexors at 5/5," and "walked well on her heels and toes, tandem gait was well performed, and Romberg was negative." (PageID.516-19).

While the record does reflect that Plaintiff chronically reported experiencing pain throughout her body, the physical exams in the record that routinely demonstrated her ability to walk normally without an aid, balance well, maintain good range of motion and strength in her extremities, and stay physically active through exercise such as biking and yoga in spite of such symptoms provide substantial evidence in support of the ALJ's determination that Plaintiff's subjective complaints as to the *severity* and *limiting effects* of her symptoms were not entirely consistent with the medical evidence.

Moreover, contrary to Plaintiff's assertions, the ALJ's decision clearly reflects that the aforementioned objective findings were not the only basis for determining that Plaintiff's subjective complaints as to the severity and limiting effects of her symptoms were not entirely consistent with the record evidence. Where the symptoms and not the underlying condition form the basis of the disability claim, a two-part analysis is used in evaluating complaints of disabling pain. 20 C.F.R. § 416.929(a); *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001); *Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir.1994).

11

First, the ALJ will ask whether there is an underlying medically determinable physical impairment that could reasonably be expected to produce the claimant's symptoms.  20 C.F.R. § 416.929(a).  Second, if the ALJ finds that such an impairment exists, then he must evaluate the intensity, persistence, and limiting effects of the symptoms on the individual's ability to do basic work activities.  *Id.*  Relevant factors for the ALJ to consider include the claimant's daily activities; the location, duration, frequency, and intensity of pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms; treatment, other than medication, an individual receives or has received for relief of pain or other symptoms; any measures other than treatment an individual uses or has used to relieved pain or other symptoms, such as lying on one's back; and any other factors bearing on the limitations and restrictions due to pain or other symptoms.  Soc. Sec. Rul. 16-3p; 20 C.F.R. §§ 404.1529(c), 416.929(a).

In addition to noting the inconsistences with the objective medical evidence, the ALJ specifically considered, among others, Plaintiff's activities of daily living, her relatively conservative treatment methods, and her testimony that she needed to be carried to the bath tub and that her symptoms caused suicidal ideation.  The ALJ noted that while Plaintiff's impairments limited her functional capacity, Plaintiff "has still engaged in social and physical activities and can still help take care of her kids, perform some chores, and independently complete several activities of daily living."  (PageID.63).  Such finding is supported by substantial evidence in the record, including Plaintiff's statements in her function report that she goes outside up to once per day, is "able" to do some household

chores alone, albeit slowly, such as laundry and cleaning, she "takes care of her kids, cleans, cooks" with the help of her "significant other, dad, mom, other family," including preparing up to one simple meal a day "on her own," and can independently handle her finances. (PageID.314). A third-party function report from Plaintiff's father also states that Plaintiff prepares simple food and meals "[a]lone – maybe 1-2x per day" though it takes "more time than it should," and she goes to doctor's appointment and her kids' plays and events with someone accompanying her. (PageID.307). Plaintiff also testified before the ALJ that she can drive, has no restrictions on her driver's license, and, on average, drives "ten hours a week" because "it's about an hour [drive] to everywhere." (PageID.87-88). Notably, office treatment records reflect that she routinely attended doctor's appointments by herself and "declined" to be accompanied by a "Chaperone." (*See, e.g.*, PageID.443 ("Chaperone declined" in April 2017); PageID.439 (same in June 2017); PageID.432 (March 2018); PageID.428 (July 2018); PageID.421 (December 2018); PageID.416 (April 2019); PageID.481 (July 2019); PageID.476 (October 2019); PageID.572 (January 2020); PageID.568 (March 2020); PageID.564 (June 2020)).

The ALJ also considered Plaintiff's generally "conversative treatment methods like chiropractic therapy and medication." (PageID.63); *see Maloney v. Comm'r of Soc. Sec.*, 480 F. App'x 804, 808-09 (6th Cir. 2012) (conservative and routine treatment is a valid consideration in assessing limitations). The ALJ noted that Plaintiff "underwent chiropractic care and reported an improvement in her symptoms at multiple treatment visits." (PageID.62). The record reflects that Plaintiff received treatment from chiropractor Dr. Shane Cousineau, D.C., on October 12, 2018, and over the course of four

13

treatments in a one-week period, continually reported "less severe" or "less intense" back pain, "feeling better," and "distinct" or "significant" improvement in her back and sciatic area.  (PageID.631-36).[4]  The ALJ also noted that Plaintiff was prescribed a regimen of medication to treat her pain symptoms, and that she reported "Gabapentin and Robaxin helped," which is supported by substantial evidence in treatment notes.  (PageID.62; *see* PageID.445 (Plaintiff reporting on March 23, 2017, that "Gabapentin helps a little" and she has "no side effects" from her medication); PageID.442 (reporting that gabapentin "helps other pains of fibro" and she "functions more on it"); PageID.438 (reporting on June 23, 2017 that "gabapentin has helped"); PageID.431 (reporting on March 21, 2018 that "gabapentin and robaxin helped"); PageID.556 (reporting on March 13, 2020 that "gabapentin helps pain," "using less" Advil, and "no motor disturbances.").

Finally, the ALJ considered Plaintiff's own testimony as to the intensity of her symptoms and determined them not to be consistent with the evidence in the record. Specifically, Plaintiff testified at the ALJ hearing that her symptoms were "[h]orrible, it's mind boggling, it's emotional, it's almost at the point of it causes me to get help because I was suicidal because of it," and such that she has to "basically be carried into the shower." (ECF No. 9, PageID.89).  The ALJ explicitly considered that "the claimant alleged that her

---

[4] The record reflects that Plaintiff stopped chiropractic treatment after October 23, 2018, when she suffered a new injury while "twist[ing] at the waist," after which for a "temporary period of time" she was recommended to engage in "no lifting or bending, no repeated lifting or bending, no pushing, pulling or carrying, and no standing for more than 5 minutes at a time," as well as "[n]o prolonged sitting." (PageID.636-38).  Her next (and only) two visits to the chiropractor were over a year later in November 2019 and February 2020 for a new injury she apparently sustained when she "slipped and fell" at home.  (PageID.640-49).

chronic pain, fatigue, and other impairment related symptoms were severe enough to cause suicidal ideation," but found that "this allegation is inconsistent with the claimant's constant denial of suicidal ideation, depression, and other impairment related symptoms" throughout the relevant period. (PageID.63). Such finding is supported by substantial evidence in the record. (*See, e.g.*, PageID.431, 432 (reporting "No depression and no suicide risk" in March 21, 2018); PageID.427, 429 (same in July 2018); PageID.423 (same in October 2018); PageID.417 (reporting no suicidal ideation, plans, or intent in April 2019); PageID.481 (same in July 2019); PageID.494-96 (same in November 2019); PageID.515 ("negative" for any psychiatric issues in February 2020)). The record evidence also supports the ALJ's statement that "claimant does not mention needing substantial assistance with showering in her treatment records or her function report." (PageID.63; *see* PageID.314 (function report stating Plaintiff's ability to "Bathe" was not affected), PageID.304 (third-party function report stating Plaintiff's ability to "Bathe" was not affected), PageID.665 (medical opinion from PA Christopher Blanchet assessing that Plaintiff does not need assistance with "Bathing," "Toileting," "Grooming," "Transferring," or "Mobility.").

In conclusion, the ALJ sufficiently articulated why Plaintiff's subjective complaints were not entirely consistent with the record, which is supported by substantial evidence.[5] While Plaintiff points to evidence that supports her allegations of pain and fatigue, "[t]he

---

[5] The Court also notes that the ALJ specifically determined that Plaintiff's condition did not satisfy the elements of Listing 14.02, which applies to SLE. (PageID.59). Plaintiff does not challenge that determination.

fact that a record may also possess substantial evidence to support a different conclusion than that reached by the ALJ or that a reviewing judge might have decided the case differently is irrelevant."  *Crisp v. Sec'y of Health and Human Servs.*, 790 F.2d 450, 452 n.4 (6th Cir. 1986).  Rather, the ALJ's evaluation of a claimant's subjective symptoms is entitled to "special deference," *Biestek*, 880 F.3d at 788, and cannot be disturbed absent a "compelling reason."  *Ritchie v. Comm'r of Soc. Sec.*, 540 F. App'x 508, 511 (6th Cir. 2013).  As discussed above, no such compelling reason exists here.

2. *Substantial Evidence Supports the ALJ's Evaluation of Christopher Blanchet, P.A.'s Medical Opinion*

Next, Plaintiff argues that the ALJ erred in evaluating the medical opinion of PA Christopher Blanchet.  (ECF No. 13, PageID.702-03).  Relevant here, on February 8, 2021, PA Blanchet filled out a "Medical Needs" questionnaire for the Michigan Department of Health and Human Services, opining that, based on a diagnosis of SLE, Plaintiff could never lift any amount of weight, could stand or walk less than 2 hours in an 8-hour workday, needs help with meal preparation, shopping, laundry, and housework, and "[d]ue to her lupus she has weakness and pain that leads to falls, dropping objects."  (PageID.664-65).

The ALJ found PA Blanchet's opinion "not persuasive" because "it is unsupported by the claimant's diagnostic imaging results, physical examination results, treatment provider observations, and activities of daily living as discussed herein."  (PageID.63).

Based on the above, Plaintiff argues that the ALJ's "rationale for discounting the medical opinion is bare and conclusory and thereby prevent[s] a meaningful review of the

16

ALJ's finding." (ECF No. 13, PageID.702-03). She argues that the "ALJ does not cite specific evidence of the record to question the consistency and supportability of Blanchet's opinion nor does she evaluate the opinion considering the factors set forth in 20 C.F.R. § 404.1520c . . ." (*Id.*, PageID.703).

The applicable regulatory criteria for evaluating medical opinions in this case is set forth at 20 C.F.R. § 404.1520c. ("For claims filed . . . on or after March 27, 2017, . . . [w]e will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) ... including those from your medical sources."). That regulation provides that ALJs must rely on the following factors when evaluating medical opinions: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors. 20 C.F.R. § 404.1520c(c). Among these, the most important factors in this analysis are a medical opinion's supportability and consistency with other sources in the record. *Id.* § 404.1520c(b)(2). Upon review, the Court finds no reversible error in the ALJ's evaluation of PA Blanchet's opinion.

As an initial matter, Plaintiff's assertion that the ALJ "does not cite specific evidence of the record to question the consistency and supportability of Blanchet's opinion" is belied by the ALJ's explicit statement that PA Blanchet's opinion was "unsupported by the claimant's diagnostic imaging results, physical examination results, treatment provider observations, and activities of daily living *as discussed herein*," and to the ALJ's many express citations to those specific records that were previously discussed, *i.e.*, "4E; 1F; 2F; 4F; 6F; 9F; 7F; 10F; 11F; 12F; Testimony." (PageID.63). As detailed above, the ALJ's decision thoroughly discussed the various treatment notes between 2017

17

and 2020 documenting Plaintiff's office visits with several medical providers, her and her father's function reports, and her testimony before the ALJ, and clearly and reasonably articulated why Plaintiff's subjective allegations concerning her symptoms were not entirely consistent with such evidence.  (PageID.61-63).  While the ALJ did not rearticulate the specifics of each record when discussing PA Blanchet's opinion, it was not improper for the ALJ to satisfy her burden by referencing her prior discussion and assessment of such evidence in finding that PA Blanchet's opinion was not consistent with the record. *See Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016) ("No doubt, the ALJ did not reproduce the list of these treatment records a second time when she explained why Dr. Bell's opinion was inconsistent with this record.  But it suffices that she listed them elsewhere in her opinion.").

Indeed, the ALJ's earlier discussion of the record provides substantial evidence in support of the ALJ's finding that PA Blanchet's opinion was not persuasive.  For instance, the ALJ discussed Plaintiff's numerous medical provider exams spanning from March 2017 through June 2020 that routinely document her ability to walk and stand normally, maintain good balance without an aid, exhibit a sufficient range of motion, stay somewhat physically active through exercise, and display "5/5" or "excellent" strength in her extremities.  (*See, e.g.*, PageID.408-09, 415-17, 419-21, 427-29, 431-33, 438-40, 442-45, 475-77, 479-81, 516-19, 564, 569).  The ALJ also considered that Plaintiff found some relief through "conservative treatment methods like chiropractic therapy and medication." (PageID.631-36; PageID.431, 438, 443, 445, 556); *see Maloney*, 480 F. App'x at 808-09 (conservative and routine treatment is a valid consideration in assessing limitations).  It

was reasonable for the ALJ to find that such evidence was inconsistent with PA Blanchet's opinion that Plaintiff could "never" lift *any* amount of weight, could stand or walk for less than 2 hours in an 8-hour workday, and was at a high risk of falling despite never using or being prescribed a walking or standing aid.  Again, while physical exams and conservative care may not directly measure Plaintiff's subjective experience with pain and fatigue, they do reflect and bear on her capacity to routinely engage in such physical activities *despite* the presence of chronic pain and fatigue.[6]

Finally, Plaintiff does not mention, much less challenge, substantial evidence in the form of state agency physician Dr. David Kroning, M.D.'s opinion, which assessed far less restrictive limitations than PA Blanchet did.  On June 13, 2019, Dr. Kroning opined that Plaintiff could occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds, stand and/or walk up to 6 hours in an 8-hour workday, sit for about 6 hours in an 8-hour workday with normal breaks, and was unlimited in pushing and/or pulling "including operation of hand and/or foot controls" other than for lifting and carrying.  (PageID.126).

---

[6] It is worth noting that PA Blanchet's only explanation for his opined limitations is a broad statement that "[d]ue to her lupus she has weakness and pain that leads to falls, dropping objects." (PageID.665).  While Plaintiff points to laboratory results and blood work indicating a diagnosis of SLE, it is well-settled that "disability is determined by the functional limitations imposed by a condition, not the mere diagnosis of it." *Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547, 551 (6th Cir. 2014); *see Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 713 (6th Cir. 2013) ("not every diagnosable impairment is necessarily disabling").  In addition to the inconsistencies with the record evidence discussed above, PA Blanchet's opinion also appears to be internally inconsistent in that he opined significant standing and walking restrictions, yet stated Plaintiff does *not* need any assistance with "Transferring" and "Mobility," nor does she need someone "in the home to provide care."  (PageID.665).  Moreover, contrary to Plaintiff's argument that "the ALJ's statements regarding [her] ability to do activities of daily living are inaccurate" because she "requires assistance to cloth[e] herself" and "Blanchet's opinion is consistent with these statements" (ECF No. 13, PageID.702-03), PA Blanchet specifically opined that Plaintiff does *not* need assistance with "Grooming" or "Dressing."  (PageID.665).

The ALJ found Dr. Kroning's opinion partially persuasive, stating, "While I did find additional limitations, this opinion is consistent with the claimant's diagnostic imaging results, conservative treatment modalities, and physical examination findings that reflect the ability to perform a range of light work activity." (PageID.63). Thus, Dr. Kroning's assessment of far less restrictive limitations also serves as substantial evidence supporting the ALJ's evaluation of PA Blanchet's opinion as not persuasive, as well as the ALJ's overall RFC finding.

In conclusion, substantial evidence in the record supports the ALJ's RFC finding and her handling of PA Blanchet's opinion. While Plaintiff contends that there is some evidence in the record that is consistent with PA Blanchet's limitations, where "the ALJ's opinion was supported by substantial evidence, it must be upheld, despite conflicting evidence." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 727 (6th Cir. 2013) (citing *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012)).

### 3. *Plaintiff Fails to Show the ALJ Reversibly Erred by Failing to Include an Emotional Support Dog in the RFC*

Finally, Plaintiff argues that the ALJ reversibly erred by failing to discuss or include limitations in the RFC related to the use of an emotional support dog. (ECF No. 13, PageID.703-04). Specifically, she faults the ALJ for failing to discuss that Dr. Donald Cousineau had "recommended an emotional support animal shortly after he diagnosed her with SLE and anxiety disorder," and stated that "an emotional support animal could help [Plaintiff] with her symptoms." (*Id.*, PageID.704).

Relevant here, based on blood and lab work indicating Plaintiff had SLE, Dr.

Donald Cousineau authored a letter dated February 9, 2021, stating that Plaintiff "has been diagnosed with anxiety disorder and Lupus.  I am familiar with her history with the functional limitations imposed by her health-related issues.  Due to her disorder, I feel she would benefit from having an emotional support animal.  This could help with her symptoms she is currently experiencing." (PageID.666).  Moreover, in what appears to be a treatment note dated February 8, 2021, there is a reference to a "Service Dog → Dx: Anxiety Disorder, Lupus."  (PageID.656).

In response to Plaintiff's argument, the Commissioner asserts that "emotional support dogs, which merely provide psychological support, comfort, well-being, or companionship, do not qualify as service animals under the law," citing to 28 C.F.R. § 36.104.  (ECF No. 15, PageID.730).  The Commissioner also argues that, in any event, Dr. Cousineau did not prescribe an emotional support animal but "merely offered a narrative" that one "could" "benefit" Plaintiff, and "the record [] does not substantiate Plaintiff's claims regarding her need for use of an emotional support animal." (*Id.*, PageID.731).  The Court agrees that Plaintiff fails to meet her burden to establish that an emotional support animal was medically necessary and thus should have been included in the RFC.

Here, there is no dispute between the parties concerning an absence of Sixth Circuit authority establishing the exact standard for incorporating a claimant's need for a service animal in her RFC assessment.  (ECF No. 13, PageID.706; ECF No. 15, PageID.730).  However, Plaintiff acknowledges that, in *Horne v. Saul*, 2020 WL 1547068 (E.D. Tenn. Mar. 31, 2020), a district court within the Sixth Circuit "found harmless error where a plaintiff fails to point to evidence in the record of use of a service dog in treatment notes,

21

or that the plaintiff ever actually utilized a properly trained service animal." (ECF No. 13, PageID.706).

In *Horne*, the court found that the "[p]laintiff has failed to establish that a service animal was medically necessary" because "[t]he referenced letter to [p]laintiff's apartment complex that he requires a service animal does not detail that such an animal was medically prescribed or provide an opinion on the impact of a service animal on [p]laintiff's ability to work." *Horne*, 2020 WL 1547068, at *12 (citing *Cordell v. Saul*, 2019 WL 6257994, at *18 (N.D.W. Va. Nov. 4, 2019) ("Generally, a letter from a medical provider that suggests an individual's use of a service dog, without further testimony or documentation of the individual's need and use of the service animal, is insufficient to establish that the service dog is medically necessary."). *See also Payano v. Colvin*, 2017 WL 4778593, at *4 (D. Nev. Oct. 23, 2017) (finding a recommendation that the claimant's dog be designated as a service animal "does not support an assessment that the dog is necessary for Plaintiff to work, nor describe how she would need any dog in a work setting" and as such "[a]ny failure to inform the vocational expert of the mere fact of having a properly-designated service dog was harmless error.").

Like in *Horne*, Plaintiff here falls well short of her burden to establish a medical need for an emotional support dog. Plaintiff's assertion that she "proffered evidence in the record to show that an emotional service dog was medically necessary" based on Dr. Donald Cousineau's vague statement that he "feel[s]" Plaintiff "would benefit" from an emotional support animal and that one "could help with her symptoms" lacks merit. (ECF No. 13, PageID.707). Plaintiff herself characterizes Dr. Cousineau's letter as a mere

"recommendation," not a prescription, and such letter does not establish an actual medical necessity.  (ECF No. 13, PageID.707).  Nor does Dr. Cousineau's letter indicate how the use of an emotional support dog would bear on Plaintiff's ability to work.  *Horne*, 2020 WL 1547068, at *12.

Plaintiff's argument that "the ALJ does not discuss the need for the animal, let alone the effect of this accommodation on [her] ability to obtain and perform work if the animal was found to be medically necessary" is misguided, as it is *Plaintiff* who "bears the burden of proving the existence and severity of limitations caused by her impairments" and that [she] has a more restrictive RFC than that assessed by the ALJ."  *Lee v. Comm'r of Soc. Sec.*, No. 19-10337, 2020 WL 1139710, at *6 (E.D. Mich. Mar. 9, 2020) (citing *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003), and *Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 423 (6th Cir. 2008)).  Plaintiff does not point to any evidence in the record of the use of an emotional support dog in her treatment notes or that she ever actually utilized one.  Nor does she attempt to explain, much less prove, the impact that an emotional support dog would have on her ability to work.[7]  *Horne*, 2020 WL 1547068, at *12.

Accordingly, the Court finds that Plaintiff failed to show that the ALJ committed reversible error by not discussing or including an emotional support animal in the RFC assessment.

---

[7] Plaintiff does not at all discuss, much less challenge, the ALJ's assessment of her mental impairments and her mental RFC.

23

## III.   CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that the Commissioner's Motion for Summary Judgment **(ECF No. 15)** be **GRANTED**, Plaintiff's Motion for Summary Judgment **(ECF No. 13)** be **DENIED**, and the ALJ's decision be **AFFIRMED**.

Dated: July 17, 2023                         s/David R. Grand
Ann Arbor, Michigan                        DAVID R. GRAND
                                           United States Magistrate Judge


## NOTICE TO THE PARTIES REGARDING OBJECTIONS

Within 14 days after being served with a copy of this Report and Recommendation, any party may serve and file specific written objections to the proposed findings and recommendations set forth above. *See* 28 U.S.C. §636(b)(1); Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d)(1). Failure to timely file objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140, (1985); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). Only specific objections to this Report and Recommendation will be preserved for the Court's appellate review; raising some objections but not others will not preserve all objections a party may have. *See Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006). Copies of any objections must be served upon the Magistrate Judge. *See* E.D. Mich. LR 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served with a copy. *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. §636(b)(1). Any such response should

be concise, and should address specifically, and in the same order raised, each issue

presented in the objections.

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on July 17, 2023.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager
